## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES ADAMS,  )  )  Plaintiff,  )  )  )  v.  )  )  )  ROSS TOWNSHIP and DOUGLAS  )  SAMPLE,  )  )  Defendants.  )  ) | 2:20-cv-00355  Chief District Judge Mark R. Hornak |

### OPINION

**Mark. R. Hornak, Chief United States District Judge**

Charles Adams thought that there was too much through traffic on the street where he lived in Ross Township, Pennsylvania. He spoke about his concerns with his local government officials. A lot. He wanted them to take official action to reduce the traffic. Those officials listened to Adams, met with him, studied the issues he raised, but only to a point, the point at which they told him that their mind was made up, and that they would not respond to his traffic concerns any further.

Adams says that their telling him that they had done all that they intended to do in order to address the issues he raised, in the way that they did, deprived him of his rights secured by the First Amendment, more specifically by retaliating against him for speaking out about traffic on his street. Because the Township and Sample, one of its local government officials who was in the thick of the traffic discussions, were within their rights when they told Adams that while they would continue to listen to him their official actions would not change, and because their responses

did not constitute impermissible retaliation for his speech, Adams's Amended Complaint does not state a claim for relief and this case will be dismissed.

Before the Court is Plaintiff Charles Adams's ("Adams") First Amendment retaliation claim against Defendants Ross Township and Douglas Sample ("Sample"). Adams began this lawsuit by filing a Complaint in March 2020 alleging that Defendants had violated his First Amendment rights to petition and to be free from retaliation. (ECF No. 1.) Defendants filed an initial Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) with a supporting brief in April 2020. (ECF Nos. 11, 12.) Plaintiff filed a brief in opposition to that Motion to Dismiss, to which Defendants replied. (ECF Nos. 15, 16.)

The Court held oral argument and questioned all counsel extensively about the claims Adams had asserted and the Motion to dismiss them. At that argument, Adams's lawyer asked the Court for leave to file an Amended Complaint, arguing that he could better support Adams's claims if given another chance to do so. Following Circuit precedent, *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir. 2004), the Court authorized such an amendment, and later issued an Order more formally granting Plaintiff's oral Motion for leave to file an Amended Complaint. (ECF No. 19.) Plaintiff filed his Amended Complaint, now alleging in a single count a violation of his First Amendment "right to be free from reprisal," in the nature of a restated First Amendment retaliation claim. (ECF No. 20.) Defendants filed a renewed Motion to Dismiss responding to the Amended Complaint, and Plaintiff responded with a Brief in Opposition to that Motion to Dismiss. (ECF No. 22.) The matter is now ripe for disposition.

For the reasons set out below, Defendants' Motion to Dismiss will be GRANTED in full.

I.      **BACKGROUND**

Plaintiff lives on West View Avenue ("Avenue"), a residential street in Ross Township, Pennsylvania. (ECF No. 20 ¶¶ 5-6.) When a September and October 2017 construction project temporary closed nearby Ivory Avenue, a road often used by commuters, they were directed to use the Avenue as a detour. (ECF No. 20 ¶¶ 11, 12.) As the result of a second construction project on the southbound I-279 Perrysville exchange, drivers also began using the Avenue as a detour in the opposite direction. (ECF No. 20 ¶ 13.) Adams claims that the heightened amount of traffic on the Avenue altered his street's quiet residential character, with drivers often exceeding the speed limit and causing safety hazards to Adams and to his daughter and grandchildren, who live next door to him. (ECF No. 20 ¶ 14-19, 21-23.) Adams alleges that the traffic did not abate after the construction's completion because the Avenue provides a shorter, quicker commute.

Adams brought his complaints about the increased traffic on his street to the Ross Township Traffic Advisory Board ("TAB"), a committee of volunteer citizens that made recommendations to the Township's Board of Commissioners on proposed changes to traffic patterns and regulations. (ECF No. 20 ¶¶ 4, 31-32.) At the time of these events, Defendant Sample was the Ross Township Manager. (ECF No. 20 ¶ 4.) Sample administered the TAB's operation and served as liaison between citizens with traffic concerns and the TAB. (ECF No. 20 ¶ 31.)

Adams alleged that he first approached Sample in October 2017 to request action to alleviate his concerns about traffic on the Avenue but found Sample "dismissive" of those concerns. (ECF No. 20 ¶ 33.) Adams circulated a petition among his neighbors which forty-four (44) others eventually signed, requesting traffic regulation changes on the Avenue that included a reduction of the speed limit and the installation of speed bumps. (ECF No. 20 ¶ 36.) Adams presented this petition at a November 14, 2017 TAB meeting and spoke to describe the problem, presenting a proposal to reduce the speed limit to 15 miles per hour. (ECF No. 20 ¶ 37.)

In response to Adams's request that the TAB place the matter on its November 2017 meeting agenda, the TAB allowed him to speak on the matter at that meeting but declined to consider the proposed speed limit reduction. (ECF No. 20 ¶ 42.) But the TAB did direct the Ross Township Police to conduct a traffic study, which led to a report showing that traffic volume had decreased since the end of the construction detour and was only slightly higher than it had been before that detour. (ECF No. 20 ¶ 40.) The police department concluded that based on this study there "was essentially no change in the traffic flow on West View Ave, and 'speed' was not a problem." (ECF No. 20 ¶ 42.) The TAB presented the traffic study results at its December 2017 meeting, and recommended implementing parking restrictions to prohibit parking at the narrowest point of the Avenue. (ECF No. 20 ¶ 44.) The TAB rejected Plaintiff's other requests for traffic calming measures, including speed bumps and a lowered speed limit. (ECF No. 20 ¶ 41.)

Adams disagreed with these results and recommendations and, over the course of the next months, continued to contact the TAB with requests for traffic regulatory changes. (ECF No. 20 ¶ 49.) When the January 2018 TAB meeting was cancelled, Defendant Sample called Adams to notify him there would be no public TAB meeting but, at Adams's request, Sample set up a meeting with Adams that the Chief of the Ross Township Police Department also attended. (ECF No. 20 ¶¶ 51–53.) Adams describes this meeting as "tense and not productive." (ECF No. 20 ¶ 53.)

In February 2018, Adams submitted a series of "right to know" requests seeking information on the traffic study and the identity of the person who cancelled the January TAB meeting. (ECF No. 20 ¶ 57.) Sample responded to the requests by acknowledging that he had cancelled the January 2018 meeting because he had determined there was no new business for the Board to consider. (ECF No. 20 ¶ 57.) Adams submitted four additional right to know requests to the TAB in March 2018 requesting more information on the Township's use of "traffic calming"

measures on other residential streets and then submitted another round of requests about one of the Township Commissioner's compensation. (ECF No. 20 ¶¶ 57, 96, 97.)

Before the scheduled April 2018 TAB meeting, Sample and the Chief of Police worked with the Township's Solicitor, P.J. Murray ("Murray") to respond to Adams's right to know requests with a written denial letter. (ECF Nos. 20 ¶ 68; 20-2.) That letter explained the Township's efforts to investigate Adams's complaints and informed him that the traffic study had revealed that Adams's proposed remedies were not warranted or appropriate. *Id.* The letter also advised him that no new traffic engineering studies would be commissioned, that "further duplicative, repetitive" requests for traffic calming initiatives would go unanswered, and finally advised that while Adams remained "free to attend open meetings of [the TAB] and speak during the public comment portion of said meetings," the TAB "[did] not intend to further respond to or offer comments to" Adams on those matters. (ECF No. 20-2, at 2.)

Defendants describe the purpose of this letter as to explain to Adams "that the [TAB] was satisfied that it had fully investigated the issue which he had brought to their attention, and that it considered the matter closed." (ECF No. 12, at 3.) On the other hand, Adams alleges that Defendants wrote the letter intending "to retaliate against" and deter him from petitioning the Township further about his traffic complaints. (ECF No. 20 ¶ 100.) Adams responded to the letter by requesting intervention from the Township Commissioner who represented his neighborhood in an email that also copied two Traffic Commissioners (ECF No. 20-4.) He received no response to that email.

Adams attended the April 2018 TAB meeting intending to again raise the traffic issue. (ECF No. 20 ¶ 77.) When Adams arrived at that meeting, Adams alleges that Sample greeted Adams by "sarcastically shout[ing] at a distance" the words "hello, Charles." (ECF No. 20 ¶ 78.)

Adams argues that he and Sample were not on "first-name basis" and alleges that the greeting was a "condescending remark" intended to "provoke" and "punish" Adams for his communications with the TAB about West View Avenue. (ECF No. 20 ¶ 78.)

Unlike prior meeting agendas, the April 2018 TAB meeting agenda included a section stipulating that public comment at the meeting would be restricted to issues appearing on the agenda. (ECF No. 20 ¶ 76.) But at the end of the meeting, Sample announced that the meeting agenda's comment limitation was an error and that anyone could speak on any topic. (ECF No. 20 ¶ 79.) Adams alleges that Defendants included the agenda stipulation to deter him from speaking at the meeting[1] and argues that these circumstances made it "impossible" for him to "formulate any reasonable statement" because Sample's "last minute" agenda clarification did not give Adams time to consider what he might say. *Id.* He also alleges that he declined to speak partially because he felt intimidated by the Solicitor's letter. (ECF No. 20 ¶ 80.)

Plaintiff's Amended Complaint did not reassert Count I of the original Complaint, which claimed that he had been deprived of his right to petition the government in violation of the First Amendment. (ECF No. 20, at n.1, 67, 100, 109, 112, 114.) The single count of the Amended Complaint alleges that Defendants violated Adams's right to be free from reprisal or retaliation for exercising his First Amendment rights. (ECF No. 20 ¶¶ 85–115.)

## II.   <u>LEGAL STANDARD</u>

Defendants move to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 22.) Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint must "state a claim to

---

[1] As noted above, Adams had requested to be placed on the agenda of a prior TAB meeting, a request that the TAB honored. He does not aver that he made a request to be placed on the agenda for the April 2018 meeting or was prohibited from doing so, even though, as explained below, he now also avers that he prepared for and planned to address his concerns at the April 2018 TAB meeting. ECF No. 26 at 12.

relief that is plausible on its face" by providing facts which "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). When determining whether dismissal is appropriate, the Court must: "(1) identify[ ] the elements of the claim, (2) review[ ] the complaint to strike conclusory allegations, and then (3) look[ ] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The Court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017). "A Rule 12(b)(6) motion should be granted when it appears to a certainty that no relief can be granted under any set of facts which could be proved." *Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340, 350 (3d Cir. 2012).

The Court accepts all of the well-pleaded facts and views the non-conclusory factual assertions of the Amended Complaint in the light most favorable to Plaintiff. And Adams gets the benefit of the inferences from those pled facts, but only so long as they are reasonable and plausible[2].

The Court will grant Defendants' motion to dismiss Plaintiff's Amended Complaint.

### III.   **DISCUSSION**

Section 1983 permits a cause of action against state actors who retaliate against a private citizen for exercising the rights protected by the First Amendment, including the rights to "peaceably . . . assemble" and to "petition the government for a redress of grievances." 42 U.S.C. ¶ 1983; U.S. Const. Amend. I. "[A]s a general matter the First Amendment prohibits government

---

[2] Because the exhibits that Adams has appended to his Amended Complaint become part of that pleading for all purposes, Fed. R. Civ. P. 10(c), the Court may and will consider them also.

officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

To plead a retaliation claim for the exercise of First Amendment Rights, a plaintiff must allege "(1) constitutionally protected conduct; 2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the protected conduct and the retaliatory action." *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017) (citing *Hartman*, 547 U.S. at 256). The Court concludes that Adams has failed to make out a retaliation claim for the exercise of his First Amendment rights because he has not alleged retaliatory action that could deter a person of "ordinary firmness" from exercising his constitutional rights.

## A. **Protected Conduct**

First, Adams has satisfied the first element of his retaliation claim by alleging that he engaged in protected conduct. The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The right to petition that the Amendment protects "extends to all departments of the Government, including administrative agencies, . . . and encompasses formal and informal complaints, . . . about matters of public and private concern." *Cole v. Encapera*, 2015 WL 8528449, at *5 (W.D. Pa. Dec. 11, 2015) (quoting *Arneault v. O'Toole*, 513 Fed. Appx. 195, 198 n. 2 (3d Cir. 2013)) (omissions in original). Protected conduct "literally involves petitioning the government, either through formal mechanisms, such as lawsuits, grievances and workers compensation claims, or informal mechanisms, such as letters to the government." *Gardner v. Barry*, 2010 WL 4853885, at *10 (M.D. Pa. Nov. 23, 2010); *see also Foraker v. Chaffinch*, 501 F.3d 231, 237 (3d Cir. 2007) *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011).

As this Court noted in *Mullen v. Thompson*, the "First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition the government for redress of grievances." 155 F. Supp. 2d 448, 452 (W.D. Pa. 2001). The Government is therefore "prohibited from infringing upon these guarantees either by a general prohibition against certain forms of advocacy or by imposing sanctions for the expression of particular views it opposes." *Id.* (citing *Smith v. Arkansas State Highway Employees Local 1315*, 441 U.S. 463 (1979)).

Adams has alleged that he engaged in conduct protected by the First Amendment when he requested that the Township take action on his traffic complaints. Adams made them in the form of written complaints and requests for information on traffic issues, and by his attending and then participating in the public comment portions of the TAB meetings and by his meeting with Township officials. These activities fall within the guarantee that "a citizen can speak freely and petition the government openly while being protected by the First Amendment in doing so." *Mullen*, 155 F. Supp. 2d at 452. Thus, the first element of Adams's retaliation claim is met, and Defendants do not dispute that Adams had exercised his First Amendment right to free speech and right to petition the government for redress of grievances regarding traffic on his street.

### B.  Retaliatory Action

The Court must determine whether Adams has sufficiently alleged that Defendants retaliated against him for his protected conduct[3]. The "key question" in determining whether there was a retaliatory act is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (quoting *Mckee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)). "The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right." *Crawford-El v. Britton*, 523 U.S. 574, 589 n. 10 (1998). In assessing a retaliation claim, the Court asks, "whether the Government is *punishing* the plaintiffs for exercising their rights." *Mirabella v. Villard*, 853 F.3d 641, 651 n. 5 (3d Cir. 2017) (citing *Miller v. Mitchell*, 598 F.2d 148, 161 (3d Cir. 2010) (emphasis in original)).

The Third Circuit has held that "[w]hether an act is retaliatory is an objective question." *Id.* at 650. To determine whether an act is retaliatory, a court therefore assesses "whether the act would deter a person of ordinary firmness, not whether the plaintiff was deterred." *Id.* As the *Mirabella* Court explained, there is good reason for this objective rule: Government officials should not be rewarded for "picking on unusually hardy speakers"; nor should they be liable "when a plaintiff is unreasonably weak-willed." *Id.* (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005). While a First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low, *O'Connor v. City of Newark*, 440 F.3d

---

[3] Adams's claims against the Township can only proceed if he can show that it acted against him in order to advance or pursuant to an official policy or practice, since the Township cannot be liable based on principles of *respondeat superior*. *McGreevey v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005). For purposes of resolving the Motion to Dismiss, the Court will assume that the letter to Adams from the Solicitor was sent to communicate an official governmental policy relative to responding to Adams expressed concerns about traffic on the Avenue and requests for more traffic studies, and that Sample as the Township Manager and liaison with the TAB was implementing its policies as the "final policy-maker" as to the conduct of the TAB's meetings and mode of any give and take with Adams on that topic in that setting. *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).

125, 128 (3d Cir. 2006), at the same time "truly *de minimis* violations" do not support a cause of action for First Amendment retaliation. *Id.*; *Herman v. Hosterman*, No. 1:11-CV-898, 2011 WL 4974184, at *3 (M.D. Pa. Oct. 19, 2011) (*de minimis* responses to protected speech "such as criticism, false accusations, or verbal reprimands do not rise to the level of actionable retaliation"); *see also McKee v. Hart*, 436 F 3d 165, 170 (3d Cir. 2006) (same).

Adams's Amended Complaint alleges that Defendants retaliated against him for his protected petitioning activity by: (1) sending a letter to Adams reporting the intent not to respond to further requests from him for traffic studies or related to the traffic on his street[4]; (2) Sample's orally greeting Adams in what he perceived to be a hostile manner before the April 2018 TAB meeting by calling out "hello, Charles" when Adams arrived at the meeting; and (3) initially including a statement on the April 2018 TAB meeting agenda limiting public comment to matters on that agenda, which did not include Adams's traffic study request. The Court concludes that Adams has failed to allege facts showing a plausible claim for retaliation under the First

---

[4] To the extent Adams implicitly contends that the Township's decision that it was not going to engage in further traffic studies or engage in a debate on those topics with him was peremptory or was made with little input by him, or that overall he did not have an actual opportunity to "speak", the record he advances belies that.

The Amended Complaint and appended Exhibits reference fourteen (14) different situations in which Adams "spoke" to and with local officials about his traffic concerns from the Fall of 2017 to April 2018: (1) submission of a citizens' petition in the Fall of 2017; (2) attending and speaking at the TAB meeting in November 2017; (3) meeting with a Township Commissioner and presenting an extensive packet of information; (4) attending the November 2018 Commissioners' meeting;(5) attending the December 2017 TAB meeting; (6) submission of three requests for action on traffic concerns; (7) a meeting with Sample and the Township Chief of Police; (8) a February 2018 request for further review of traffic issues; (9) February 2018 right to know requests; (10) the submission of four suggestions for traffic remediation in March 2018; (11) a March 7, 2018 right to know request; (12) a March 2018 email exchange with a Township Commissioner; (13) four additional right to know requests on March 8, 2018; and (14) an April 7, 2018 email communication with a Township Commissioner. *See* ECF Nos. 20-1 through 20-4.

The Solicitor's letter advising Adams that the TAB and Township would engage in no further traffic studies and had in essence made up its mind on the merits of those issues was dated March 28, 2018. ECF No. 20-5. Adams himself pleads that after receiving the Solicitor's letter, he "tested" it by communicating further with both a Township Commissioner and with the Solicitor, apparently without incident. ECF No. 20 ¶¶ 73-74. Thus, his Amended Complaint reveals that the Solicitor's letter did not inhibit his continuing to "speak" to local officials, since he says that he did just that after receiving the letter. His real issue appears to be that they did not respond to him. *Id.*

Amendment because none of these actions, considered objectively,  cannot be plausibly construed as retaliatory.

First, Adams argues that the letter from the Township Solicitor was retaliatory conduct because it expressed an "edict" that no Township official would respond to or offer comments on his traffic concerns. (ECF No. 20 ¶ 72.) But the First Amendment "provides no guarantees that a speech will persuade or that advocacy will be effective." *Smith*, 441 U.S. at 464–65. Although the First Amendment protects a citizen's right to associate and speak freely and petition openly, "[n]othing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 285 (1984). A First Amendment retaliation claim therefore may not stem from government officials' refusal to listen or respond to petitions on public issues. *See Marinkovic v. Battaglia*, 2016 WL 3745856, *3 (W.D. Pa. 2016). The First Amendment right to petition imposes no obligation on the Township to listen or respond to Adams's requests or take what Adams might view as favorable official action based on them. And it is not retaliatory to tell a citizen speaker that the local government officials will proceed in such a fashion.

Adams concedes that the government need not respond to or act on citizens' petitions. (ECF No. 26, at 6.) Even so, he argues that the letter constituted a retaliatory act because a "person of ordinary firmness" would be dissuaded by the implication from the letter that future speech "would be futile." *Id.* But given that the First Amendment does not guarantee that speech will be effective, it also does not prohibit a governmental body from expressing its intention not to act in response to more speech. The letter's statement that the Township intended to "make no response" to Adams's requests for more traffic studies simply confirmed that, as the First Amendment allows,

it did not intend to "listen, to respond, or to bargain" with Adams in response to any further petitions for such endeavors. *Smith*, 441 U.S. at 465. Thus, even if Defendants intended to communicate that further engagement with the TAB or the Township regarding traffic issues on Adams's street would turn out to be futile when viewed from Adams's perspective, that would be a message that the public officials were permitted to communicate, since the First Amendment imposed no duty on them to respond positively, or to respond at all.

The Solicitor's letter facially did not prohibit Adams from speaking; it said the opposite. And as Adams pleads, he communicated twice with local officials on these matters after he received that letter. ECF No. 20 ¶¶ 73-74. The letter stated that the local government had made up its mind on the topic of interest to Adams. And that the letter would not from an objective standpoint  deter a person of "ordinary firmness" from speaking further on the matter, or more importantly, would suggest that they would suffer any negative consequences (beyond perhaps personal frustration) if they did so. Such a suggestion would be an unreasonable inference from the language of the letter itself. The letter's affirmative provisions stated exactly the opposite, and even from a subjective standpoint, Adams actually did "speak" further after receiving it. Given that the First Amendment does not impose on a local government an obligation to honor a request made by a petitioner, Adams's suggested inference that being told just that by the Solicitor is retaliatory is unreasonable as a matter of law[5].

---

[5] This is also consistent with the principle that the First Amendment does not prohibit public officials from being critical of the speech or writings of citizens directed at those same officials, nor from responding in opposition to speech directed to them. *Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1016 (D. C. Cir. 1991); *see Bond v. Floyd*, 385 U.S. 116, 136 (1966). Contrary to what appears to be the meat of Adams's Amended Complaint, the First Amendment did not compel the involved public officials to agree with the substance of the petitions that Adams presented to them, and the First Amendment protected *their* right to tell him so.

And although Plaintiff also alleges that he was "taken aback" by the letter from Solicitor Murray because that letter "elevated the problem into the legal sphere,"[6] ECF No. 20 ¶ 72, the letter did not threaten legal action. Instead, it reassured Plaintiff of his right to attend and participate in public TAB meetings –facially supporting Defendants' affirmation that it was written by the solicitor "for the very purpose of making sure that no infringement of the First Amendment would be implied." (ECF No. 23, at 8.). It is objectively unreasonable for Adams to contend that the TAB actually meant the exact opposite of what it said.

Adams also alleges that Defendants wrote the letter "in direct response to Adams's "heightened first amendment activity" of submitting multiple right to know requests to the Township around the same time, and that it was intended to "stifle" his speech and petitions. (ECF No. 26, at 4.) To be sure, the Solicitor's letter was in response to Adams's various inquiries to the TAB about traffic issues, but given that much of Adams's Amended Complaint protests his not receiving responses to each and every one of his contacts, it is more than a bit disingenuous for him to also contend that it was somehow retaliatory that the TAB, through its Solicitor, did respond to his communications via that letter.

But more than that, although the letter stated the Township's intent to not respond further to duplicative traffic study requests from Adams, it did not ask or demand that Adams stop making those requests. (ECF No. 20-2.) This case is therefore far different from *Mirabella*, where the

---

[6] Given that Adams had formalized many of his information requests as official "right to know" requests using the form developed by the Commonwealth of Pennsylvania's Office of Open Records, ECF No. 20-3, it would be objectively unreasonable for Adams (or anyone else) to have been surprised that the TAB or the Township referred these matters to its lawyer, or that the lawyer responded to them. After all, it was Adams himself who "elevated" those requests by formally invoking his rights under Pennsylvania's Open Records Law. Further, given that the Solicitor's letter affirmatively told Adams that he was free to "speak" to the TAB and/or the Township on any matter as part the public comment section of public meetings, and offered to provide Adams with additional copies of prior traffic studies, and made no mention of any limitation on Adams's ability to submit "right to know" requests under Pennsylvania's Open Records Law, and in fact did not mention that law at all, it is objectively unreasonable and implausible to conclude that the letter somehow limited his ability to make further "right to know" requests. ECF No. 20-4 at 23–24.

Court determined that an email that completely prohibited plaintiffs from contacting town officials and employees in the future "for any reason" constituted retaliatory action sufficient to deter a person of ordinary firmness from exercising their constitutional rights. *See* 853 F.3d at 650.

Here, the letter notified Adams that though he was free to continue submitting requests for further traffic studies to the township, those requests would not result in any further studies being performed. ECF No. 20-4, at 23–24. That letter could not plausibly be found to be an impermissible retaliatory act. At most (even looking at it in the way most favorable to Adams), it was an unfavorable official response to Adams's official inquiries. The First Amendment does not prohibit a local government or its officials from considering the inquiries directed to them and then responding on the merits as they deem appropriate, including through their lawyer. And here, considered objectively, a person of ordinary firmness would not have been deterred either by the fact that the letter was written by the Solicitor or the letter's statement that the Township intended to not respond to Adams's future petitions for more studies. To hold otherwise in the circumstances alleged here would implicitly and necessarily impose an obligation on the TAB or the Township to *favorably* respond to Adams's requests, an obligation the First Amendment does not generate.

Adams next argues that Sample's greeting to him by his first name at the April 2018 TAB meeting constituted retaliation for his protected petitioning activity. The parties agree that, in full, Sample's remark was limited to two words to Adams: "Hello, Charles." (ECF Nos. 20 ¶ 78; 23, at 6.) Adams argues that he and Sample were not on a first name basis, and that the gesture was not a friendly greeting but a "condescending remark" intended to provoke Adams and punish him for his protected activity. (ECF No. 20 ¶ 78.)

When it is alleged that a government official individually retaliates against the speech of a citizen in an official capacity by that official himself engaging in speech on a matter of public

concern, that conduct can support a First Amendment retaliation claim only if the official's act is of a "particularly virulent character." *Conard v. Pennsylvania State Police,* 902 F.3d 178, 182–84 (3d Cir. 2018); *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001). That means the conduct has to be a "threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." *Mirabella,* 853 F.3d at 651 (quoting *McLaughlin*, 271 F.3d at 573). Here, if the challenged greeting is considered to be an official act, or speech as to a matter of public interest, the act alleged—Sample greeting Adams by Adams's first name in an allegedly sarcastic manner—cannot plausibly be seen as a "particularly virulent act." And beyond that, there is no basis alleged that would show that it was a threat, coercion or intimidation that would intimate to a person of ordinary firmness that some form of punishment, sanction, or adverse regulatory action was about to follow[7].

Alternatively, if this alleged act of retaliation is to be considered Sample's own speech relative to a personal concern rather than the public's business, a different standard applies. *Conard*, 902 F.3d at 183. In such cases, the speech need not be of a "particularly virulent character" to make out a First Amendment retaliation claim. *Id.* But that burden being lighter does not mean that it is weightless. For instance, in *Mirabella*, the Court determined that the First Amendment retaliation claim failed where Township officials told plaintiffs that they would move for litigation sanctions if plaintiffs sued the Township, because the "quantum of governmental authority brought to bear" by that statement "was minimal." *Id.* at 651. After all, threatening litigation sanctions

---

[7] To the extent the TAB and the Township's decision to take no further action relative to traffic on the Avenue is some sort of "regulatory action", it had already been "taken" by the time of the greeting as the Solicitor's letter made plain, meaning that the alleged retaliatory action had occurred before the time of the greeting and not after. And, Adams remained at the meeting in question, and as he has told the Court, he came to the meeting intending to speak about his traffic concerns and would have been capable of doing so, notwithstanding the tenor of Sample's greeting to him. As he advises, he had "spent months formulating new ideas and waiting for the opportunity to be heard". ECF No. 26 at 12.  His own representations demonstrate that he came to the TAB meeting ready to speak and elected to not do so when the opportunity was provided to him and all others present at the meeting.

against someone who might exercise a core First Amendment right by bringing a lawsuit means that the target of that statement could be forced by court order to pay money if sanctions were actually sought. But in *Mirabella*, that was deemed not sufficiently threatening so as to constitute a retaliatory act. As a matter of law, Sample's greeting Adams even in what Adams considered to be in a "condescending" fashion simply does not meet even that measure.

In the Court's estimation, even a sarcastic greeting falls far short of the official statement about litigation sanctions at issue in *Mirabella*. Here, the "quantum of governmental authority" brought to bear by Sample's greeting was so minimal so as to approach the vanishing point. The two-word first name greeting described, even if uttered in a hostile or sarcastic way is simply legally insufficient to objectively convey any "threat, coercion, or intimidation" hinting that subsequent punishment might ensue for the exercise of Adams's rights. This is especially the case because the Township's Solicitor had already provided written, express reassurance that Adams retained the same right as other Township residents to participate in TAB meetings and voice his concerns, even though the Solicitor's letter also told Adams that the TAB's and Township's mind was already made up. So even if the higher "particularly virulent character" standard does not apply, this greeting in the circumstances alleged does not plausibly support a conclusion that considered objectively, a person of ordinary firmness would be deterred from speaking further, even if the pleading bar is seen as "very low". *O'Connor* 440 F.3d at 127–28. At most, it is a *de minimis* act akin to a "verbal reprimand" that is simply not actionable.

Finally, Adams alleges that the Township retaliated against him by including a statement on the April TAB meeting printed agenda limiting public comment to agenda matters. Adams admits that this limitation was not enforced by the TAB at the meeting, and that Defendant Sample announced toward the end of the meeting that it was a typographical error and opened the floor for

public comment on matters not included on the agenda. (ECF No. 20 ¶ 79.) Adams nevertheless argues that although he was therefore presented the opportunity to make public comment, he no longer felt prepared to give a response because he had believed for the meeting's duration that the TAB would not permit him to speak[8]. *Id.* He argues that it was "impossible to formulate any reasonable statement" under these circumstances. *Id.*

But under the objective test, the question is not whether Adams personally felt deterred from exercising his right to speak at the meeting. Instead, a Court must ask whether, considered objectively, a "person of ordinary firmness" would have been deterred from exercising their right to engage in protected conduct by such an allegedly retaliatory act. *Mirabella*, 853 F.3d at 649–650. The answer to that question is "no". A "person of ordinary firmness" would not have been so intimidated by the initial agenda statement so as to be deterred from speaking publicly once Sample retracted that proviso at the very same April meeting.

At the end of the meeting, Sample announced that the agenda proviso was a typographical error and explicitly opened the floor to public comment by anyone on any topic. And Adams does not allege that the proviso appeared again on the agendas at any future meetings, and does not allege that at any future time he was prohibited from again exercising his right to voice concerns about the traffic problems he identified, or about anything else. Beyond that, given the depth and persistence of Adams's years' long focus on these traffic issues, it is objectively implausible for Adams to now assert that he was suddenly at a loss for words when given the chance to (again)

---

[8] Logic compels that whatever Adams came to the meeting to say was still known to him while he was at the meeting, and that once Sample stated toward the end of the meeting that anyone could speak on any topic, Adams would have been in a position to speak his piece without any limitation. After all, he affirmatively states that he had been formulating his "new ideas" for months before coming to that meeting and had been "waiting for the opportunity to be heard". ECF No. 26 at 12. Adams was present for the entire meeting, and he and all others present were given the opportunity to be heard on any topic, agenda or not, before that meeting ended.

speak about those issues at a meeting he himself says that he attended in order to speak about traffic matters, and when he says that he was fully prepared to do so. ECF No. 26 at 12.

Adams does not plead that he was foreclosed by the Defendants from asking the TAB to include his topic on the agenda for any of its meetings, and he does not allege that he was foreclosed from continuing to communicate his concerns to TAB members or other Township officials by email, telephone, or letter, or at any meetings. And he pleads that he did so even after receiving the Solicitor's letter. Therefore, to the extent that he complains that the agenda proviso would have precluded him from petitioning by way of his favored procedure for a portion of one TAB meeting, he has failed to plausibly show that Defendants prohibited him from expressing his opinions and proposals publicly. And as an objective matter, a person of ordinary firmness would not have been so deterred by a momentary limitation of public comment at one TAB meeting so as to believe that they were compelled to forever refrain from expressing petitions for relief to the TAB and Township Commissioners through the multiple other avenues that remained open. That is especially the case here, where at that same meeting, the TAB permitted anyone, including Adams, to address that body on any topic.

Although *O'Connor* establishes that the threshold for pleading a First Amendment act of retaliation is very low, "*de minimis* responses to protected speech such as criticism, false accusations, or verbal reprimands do not rise to the level of actionable retaliation." *Herman v. Hosterman*, No. 1:11-CV-898, 2011 WL 4974184, at *3 (M.D. Pa. Oct. 19, 2011). In *Herman*, the court found the alleged instances of retaliation insufficient as a matter of law where a plaintiff alleged that the defendant was deeply antagonistic towards him, instigated an investigation into the plaintiff that ultimately resulted in no adverse action, and "made a false accusation about plaintiff's comfort in carrying a firearm." No 1:11-CV-898, 2011 WL 4974184, at *3 (M.D. Pa.

Oct. 19, 2011). The court concluded that these allegations were "precisely the type of *de minimis* allegations that the Third Circuit has found are insufficient to support a claim for First Amendment retaliation." *Id.* (citing *Revell v. City of Jersey City,* 394 F. App'x 903, 906 (3d Cir. 2010) (plaintiff's allegations, "which were equivalent to a few criticisms, admonishments, or verbal reprimands, do not rise to the level of a campaign of retaliatory harassment").

Adams has similarly failed to identify retaliatory conduct sufficient to support a First Amendment retaliation claim. The Township took no affirmative step to prevent Adams from repeatedly, freely expressing his viewpoints. Instead, the letter sent through the Township's Solicitor only advised Adams that it did not intend to act as he urged, while also reaffirming Adams's right to keep engaging in First Amendment activity. The allegedly hostile two word public greeting of Adams by Sample at most constituted speech from a Government actor in the form of criticism or a "verbal reprimand" falling far short of the kind of "threat, coercion, or intimidation," that *Mirabella* requires for Government speech to constitute a retaliatory act, and even if considered as being only about a "private matter" it would not plausibly deter further speech by a person of ordinary firmness when that standard is considered as an objective matter. And objectively, a person of ordinary firmness would not have been deterred from exercising their First Amendment rights by the one-time meeting agenda proviso limiting public comment to agenda items –especially once Sample retracted it during that very same meeting. Adams has therefore failed to allege retaliatory conduct meeting *O'Connor*'s "deterrence threshold." 440 F.3d at 128. Even considering all reasonable inferences in Adams's favor, the Township's and Sample's actions are insufficient to support a First Amendment retaliation claim.

Because no retaliatory conduct has been identified sufficient to make out a First Amendment retaliation claim, the Court need not reach the third element of such a retaliation

claim, which requires a causal link between the alleged retaliatory act[9] and a plaintiff's constitutionally protected activity. Adams has failed to establish the second of the required elements of a First Amendment retaliation claim and has thus failed to state a claim upon which relief can be granted.

The First Amendment protects Adams's right to speak to local government officials, but it does not obligate local government officials to agree to the action a citizen petitioner seeks to have them take, or to even seek or receive public input before making policy decisions. *Knight*, 465 U.S. at 283–86. And while carrying out their duties, they too retain the right to speak in response and even in opposition to speech directed to them by petitioning citizens such as Adams. *See Caristo v. Blairsville-Saltsburg Sch. District*, 370 F. Supp. 3d 554, 571–72 (W.D. Pa. 2019). They need not only "take" the citizens comments directed to them but may also consistent with the First Amendment "give" their response to those entreaties, and the fact that their response is contrary to the desires of the citizen speaker does not make it retaliatory.

Adams had, and vigorously exercised, a right to speak repeatedly on the local traffic issues important to him using a variety of avenues. The TAB and the Township responded to the substance of Adams's petitions by hearing him out at multiple meetings, commissioning a traffic study on the issues he advanced, reporting the results of that study, and even meeting with Adams

---

[9] The Court would observe that since Adams has not pled that he has ever actually been barred for speaking on his traffic issues, or petitioning local government about those issues, no matter how unsuccessful those efforts turned out to be, it is hard to identify any actual deprivation of any of Adams's First Amendment rights. He pleads only that as a subjective matter, that is what he concluded. But our Court of Appeals has long held that the test is objective, not subjective, and considered in that light, Adams's averments fall short of the mark as a matter of law.

The Court would also note that although given leave to amend his complaint, there is no assertion that Adams sought to petition or speak on the traffic matters important to him and was barred from doing so at any point after the April 2018 TAB meeting. At most, he reasserts that the notice in the Solicitor's letter that the TAB did not intend on engaging in further traffic studies had subjectively deterred him from speaking, notwithstanding that he twice did so after receiving the letter. ECF No. 20 ¶¶ 73–74, 83–84. But, as noted above, the First Amendment does not require local government officials to respond affirmatively to the petitions presented to them, so the lack of a positive response to his post-letter entreaties could not be prohibited retaliation in the circumstances presented here.

personally – until they eventually advised Adams that they had done all that they planned to do and that they intended to take no other actions in those regards. Adams had the right and the opportunity to keep speaking to his local officials, but they also had the right to speak back to him by telling that their minds were made up and even if Adams did not prefer what they had to say.

The Amended Complaint does not support a plausible conclusion that such a course was impermissible retaliation for Adams exercising his rights secured by the First Amendment[10].

## IV.   CONCLUSION

For the reasons set out in this Opinion, the Defendants' Motion to Dismiss (ECF No. 22) will be GRANTED. Adams was allowed to amend his Complaint and to put his best pleading foot forward in the Amended Complaint, after full briefing on the first Motion to Dismiss and full oral argument on that Motion. His latest effort to assert a valid First Amendment retaliation claim still falls short of the mark because the alleged instances of retaliation are insufficient as a matter of law to deter an individual of ordinary firmness from exercising his First Amendment rights. And

---

[10] Sample also invokes the doctrine of qualified immunity. That principle shields a government actor from money damage claims for the violation of a federal right, unless the plaintiff has successfully pled both a Constitutional violation and that the right allegedly violated had been clearly established by controlling precedent at the time of the alleged violation. *El v. City of Pittsburgh*, 975 F 3d 327, 334 (3d Cir. 2020). Because the Court concludes that the Amended Complaint fails to state a Constitutional violation, that principle would apply. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Adams also has not pointed to controlling precedent that in the focused context of the facts alleged would have shown the violation of a right that was clearly established at the time of alleged violations. Adams points to *Mirabella* as such a case, but that misses the mark. The "right" clearly established in *Mirabella* was that it would violate the First Amendment for local government officials to impose an outright ban on a citizen communicating to them. 853 F.3d 641, 650 (characterizing government official's email as retaliatory where it constituted a "complete prohibition against Plaintiffs contacting town officials and employees for any reason").

This case sharply contrasts with *Mirabella*. Not only did the Township not ban further petitions from Adams, it sent a letter explicitly reaffirming his right to continue to communicate with the Township. And it would turn *Mirabella* on its head to assert that it somehow "clearly established" a First Amendment right for a citizen to receive a response or positive action from government officials, especially when the case law holds the opposite. Adams has not pointed to any controlling case that would have "beyond debate" put Sample on notice that his actions, in these specific circumstances, were contrary to a "clearly established" Constitutional right. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (asserted right must not be defined at a high level of generality, but only within the specific factual context alleged).

he seeks to assert his single First Amendment claim in an Amended Complaint consisting of 27 pages and 116 paragraphs with 43 pages of exhibits appended, filed with the benefit of experienced counsel. From all of that, the Court reasonably concludes that Adams has now given making his case his best shot, and any further effort at amendment would be futile. For that reason, this action will be DISMISSED with prejudice.

   An appropriate Order will follow.

s/Mark R. Hornak     

Mark R. Hornak

Chief United States District Judge

Dated: March 16, 2020